JACOB N. COHEN *vs.* P. E. HARDING CONSTRUCTION CO.

MAY 25, 1918.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Baker, and Stearns, JJ.

(1)  *Contracts.  Novation.*

Plaintiff was a sub-contractor under the defendant, the contract providing for payment of "80% of all completed work every thirty days, balance thirty days."  Defendant became financially involved.  Thereafter an agreement was executed between defendant and every sub-contractor, setting out that "we the subscribers hereby agree to the following plan for carrying said work to completion and *for the payment* of our accounts," providing for the receipt and disbursement by an agent of all payments thereafter made under the contract between defendant and the owner, the sub-contractors agreeing to make no claim for payment upon labor and materials furnished prior to the agreement until defendant's contract with the owner was entirely completed; for work and materials furnished under the original contract with defendant, the sub-contractors upon receipt by the agent of the payments in the future made by the owner under the contract with defendant were to be paid 80% of the sums set forth in the certificates of the architect and when the defendant's contract with the owner was entirely completed, then the agent from the amount received as a final payment from the owner was to pay the sub-contractors ratably in proportion to their then unsatisfied claims under their contracts with defendant.  As to any additional labor or materials furnished necessary for the completion of the work, outside of the original contracts, payment was to be made in full by the agent.  Upon completion of the contract and payment by the agent of all funds in his hands, plaintiff brought suit to recover the difference between the amount received and that named in the original contract with defendant.  Defendant pleaded the agreement in accord and satisfaction.

*Held,* that the facts did not disclose a case of novation as it was not the intention of the parties to extinguish the original contract, but to modify it as to the terms of payment.

*Held,* further, that considering the circumstances attending the execution of the agreement, it was the intention of the parties that the pro rata payments were to be accepted in satisfaction of the claims of the sub-contractors under their existing contracts with defendant.

*(2)   Payment.*

The word "payment" is used in two senses: 1.   Performance of a contract to pay money according to its stipulations;  2.   Extinguishment of a cause of action arising from a breach of contract.

ASSUMPSIT.   Heard on exceptions of plaintiff and overruled.

BAKER, J.   This is an action of assumpsit brought to recover a balance of $595.88 alleged to be due him for material and labor furnished the defendant corporation in the erection of the kitchen and service building at the State Hospital in Cranston, Rhode Island.   The plaintiff's declaration contains two counts on as many express contracts and the common counts.   The defendant filed six special pleas, setting out in different ways that in place of the agreements declared upon at a later date another agreement (which is set out verbatim in the second plea) had been entered into in substitution therefor;  that the substituted agreement had been kept and performed by the defendant and that all payments due the plaintiff thereunder had been paid;  that the same had been received in accord and satisfaction;  and that the defendant had been discharged and released.

The case was tried June 6, 1917, before a justice of the Superior Court sitting with a jury.   At the close of the testimony each party moved for the direction of a verdict. The court denied plaintiff's motion and granted the defendant's.   The plaintiff excepted to the denial of his own and to the granting of defendant's motion and the case is before this court upon plaintiff's bill of exceptions, which contains only these two exceptions.

The testimony shows that under date of January 1, 1915, the plaintiff, who is a cornice worker or tinsmith, wrote to the

defendant offering "to furnish and put up according to plans and specifications furnished" by Martin & Hall, architects, certain specified roofs, flashings, gutters, conductors and other similar materials for said kitchen and service building for the sum of $3,310 to be paid for in the following manner; "80 per cent of all completed work every 30 days, balance 30 days;" and that the defendant by its letter dated January 12, 1915, accepted said offer, with the additional statement that the work was to be "to the entire satisfaction of the architects."

It further appears that in the fall of 1915, apparently near the end of September, the defendant, after having completed about two-thirds of the work called for under its contract for the erection of said kitchen and service building, found itself in financial difficulties of so serious a nature as to render it unable to go on with the work and it so notified the Board of Control and Supply with which as representing the State the defendant had its contract, and also the company which was surety on its bond for the performance of the work. All work on the job ceased for two weeks or more. There were several thousands of dollars (nine or ten it is stated) due sub-contractors for the work already done by them which they felt would be a total loss if the surety on defendant's bond undertook the completion of the contract. To avoid this loss as a whole or in part, some of the sub-contractors requested the defendant to carry on the work under an arrangement by which they would go on and complete the job and receive and share pro rata the moneys still to be paid by the State under its contract. As a result of this effort, with the consent of the Board of Control and Supply, an agreement in writing under seal was drawn up and later signed by every sub-contractor as well as by the defendant, work was resumed and the contract of the defendant with the State was carried to completion. The agreement was prepared without legal advice by Mr. Hall, the architect supervising the work. It runs as follows:

"PROVIDENCE, R. I., October 11, 1915.

*To whom it may concern:*

We, the subscribers hereto, who have agreed to furnish or have furnished certain labor, material, or both, used or to be used by the P. E. Harding Construction Company in the construction of the Kitchen and Service Building and other work for the State Hospital, Cranston, R. I., hereby agree to the following plan for carrying said work to completion and for the payment of our accounts:

"1.   That Stephen C. Potter be appointed disbursing agent for the P. E. Harding Construction Company with power to receive all payments hereafter made by the State of Rhode Island under its contract with said company for the construction of said building and work.   Said payments to be made upon the Architects' certificates duly issued to said company, as required by said contract, and to be forthwith and in the presence of the Secretary of the Board of Control and Supply of said State of Rhode Island, endorsed over by said Company to said disbursing agent; said disbursing agent upon receipt of said payments, to disburse same to the several creditors, in amounts equal to 80% of the sums set forth in the certificates of the Architects upon which said payments are based; said agent also to pay to said Company a sum equalling the cost of labor and material supplied by said Company and set forth in said Architects' certificates; statements of all such disbursements signed by the said agent, to be presented, one to the Secretary of the Board of Control and Supply and another to Martin & Hall, Architects, immediately after said payments are made and said statements are to fully disclose the names of all parties to whom payments are made; upon demand of the State, receipts for said payments are to be deposited by said agent with the Secretary of the Board of Control and Supply.

"2.   That no claim will be made for further payment upon labor and material furnished to the P. E. Harding Construction Company (for use in this work) prior to

October 1, 1915, until the time when their contract is entirely completed, when said disbursing agent is to pay to said creditors, pro rata, from the full amount received from the State as a final payment under such contract; each creditor receiving a sum representing the proportion which his, their, or its full claim bears to the total amount paid said Company under said contract, it being understood that if any balance remains after all creditors on this work are paid in full, it is to be paid to said Company.

"3. That such of the subscribers hereto as have agreed to furnish labor and material, in excess of that already supplied, will fulfill said agreements promptly and in a manner to best conserve the interests of the work.

"4. That the P. E. Harding Construction Company is to notify the disbursing agent, the Secretary of the Board of Control and Supply and the Architects in writing immediately after making contracts for or purchasing such additional labor and material as may be necessary for the completion of the work, and which is not already contracted for, stating the amount of such contracts or purchases, and that payments for such work shall be made from time to time by the disbursing agent in the manner specified for other payments to the full amount of said contracts or purchases.

"Witness our hands and seals the 15th day of October, 1915.

"In presence of."

At that time $1,250 was due the plaintiff for materials and labor already furnished, and nothing had been paid to him under his contract. The plaintiff thereafter in May, 1916, contracted with the defendant to furnish certain other materials for $125 and for this he was paid in full in accordance with paragraph 4 of the agreement of October 11, 1915. He received $1,648 under the 80% provision of paragraph 1 of said agreement and $1,066.12 as 64.29% of said sum of $1,250 due when said agreement was drawn and of the aggregate sum due under the deferred payments of 20% under the agreement of October 11, 1915, or a total of

$2,714.12 under the original contract of January, 1915.  It is for the difference of $595.88 between this sum and the amount named in the original contract that the plaintiff now sues.

There is testimony to the effect that when certain sub-contractors requested the defendant to resume work and complete its contract with the State, they promised that if it would do this and provide for their receiving pro rata the moneys yet to be paid by the State under defendant's contract with it, they would release the defendant of all their claims against it "when the job was done."   After the work was completed, under the advice of counsel the defendant had an instrument in writing prepared, dated October 3, 1916, which was executed by all of the signers of said agreement of October 11, 1915 (except the present plaintiff), whereby they released the P. E. Harding Construction Company from all claims and causes of action which they then had against it.

The plaintiff was the last creditor to sign the agreement of October 11, 1915, and did so after some solicitation at the State House in the presence of the State Board, and he says with the understanding that he "was to take whatever money there was left from the job but still collect my money from the Harding, whatever balance there was."   Two witnesses testify that they gave the plaintiff to understand, before he signed the agreement, that under the agreement, when the work was completed "the Harding Company was going to be released from any claim growing out of that job." This he denies.   The court granted the motion to direct the verdict "on the ground that the agreement of October 11, 1915, was made in substitution of the original contract as to the time and manner and amounts to be paid thereunder."

(1)    Both plaintiff and defendant have argued the case as if the question at issue were whether the contract of October 11, 1915, in so far as it affected the then existing contractual relations of the parties to this action, was "entered into for

the purpose and with the effect of dissolving" the original contract entered into by and between them in January, 1915, that is, whether it was a case of novation. One of the requisites of novation is the extinguishment of the old contract by the new one. See 20 R. C. L. Novation, Secs. 1, 2, 5; 29 Cyc. 1130, 1133; 21 Am. & Eng. Encyc. of Law, 663, 671. We think it obvious, however, that this is not a case of novation, as it is perfectly clear that it was not the purpose of the plaintiff and defendant to extinguish the original contract by the making of the new one. The old contract was simply modified in some particulars. A reasonable interpretation of the agreement of October 11th (having in mind all the parties thereto) is that in order to carry the work to completion so that they might receive payment of their accounts, the sub-contractors in effect bound themselves to carry to completion the contracts they then had with the defendant, provided the defendant consented, as it did, to have all the money still to come to it from the State distributed by the disbursing agent named in said agreement in the manner and in the proportions therein set forth. So far as it affected the plaintiff the amount and kind of materials to be furnished by him under his original contract was neither increased nor diminished. Indeed, unless the first contract continued to be in effect, it would be impossible to ascertain from the agreement of October 11th what thereunder the plaintiff was obligated to do. The modifications of the plaintiff's contract relate to the terms of payment. Originally they were "80 per cent. of all completed work every 30 days; balance 30 days." By the agreement of October 11th the plaintiff agreed to make no claim for "payment upon labor and materials furnished . . . (for use in this work) prior to October 1, 1915" until defendant's contract with the State was entirely completed; for work and materials to be furnished under his original contract after October 11th the plaintiff upon receipt by said disbursing agent of the payments in the future made by the State under its contract with the de-

fendant was to be paid 80 % of the sums set forth in the certificates of the architects. When the defendant's contract with the State was entirely completed, then said disbursing agent from the amount received from the State as a final payment was to pay said sub-contractors ratably in proportion to their then unsatisfied claims under their contracts with the defendant made before October 11th, that is, the plaintiff was then to receive his proportionate part on the amount then due him, including in such amount all sums due him on October 1, 1915, and the total of the 20% withheld on the payments made to the plaintiff after October 11th. It follows, as has already been stated, that the plaintiff's original contract was not extinguished, but modified, and that there was no novation.

The court below apparently regarded the agreement of October 11th on its being carried out as in some manner operating as a satisfaction of defendant's indebtedness to the plaintiff based upon their contract of January, 1915, as just before he granted defendant's motion, he is reported to have said, "You must give some reasonable construction to an agreement and while technically it doesn't use such language as you would use as a lawyer, what is meant when it says that this agreement is entered into for the payment of our accounts? Doesn't that mean in satisfaction of our accounts?" While he puts the matter in interrogative form it may be regarded as an affirmative expression of his interpretation of the contract as he almost immediately afterwards remarked, "I do not see anything to go to the jury on because there is no question of fact here that I see." If there be such satisfaction, how is it effected? The agreement of December 11th has not the technical characteristics of an accord and satisfaction, which is usually limited to a debtor and single creditor. Neither has it the character of a settlement by compromise, which is ordinarily based upon a dispute or controversy, which is adjusted by mutual concessions. The agreement under consideration has more of the features of a composition with creditors by an em-

barrassed or insolvent debtor, in so far as it may effect a discharge of existing indebtedness, if it has such effect, than those of accord and satisfaction. It is an agreement between the creditors themselves as well as between them and the debtor. They mutually agree to the application of certain funds towards the pro rata payment of their existing claims against the debtor and of the future indebtedness to become due to them on the completion of their existing contracts with such debtor. It is an essential element of every composition agreement that there should be the mutual understanding, among all who become parties to it, that each is to take the composition agreed on, and to forbear further to press or insist on his claims. 5 R. C. L. 869, 870. The same result, therefore, follows as in an accord and satisfaction. The consideration in such agreement is found in the relinquishment or possible relinquishment by each creditor of a part of his claim. 1 R. C. L. 178. The agreement under consideration is plainly not a composition with all of the defendant's creditors, as the evidence shows that it had other creditors than those signing it. And if it be a composition it does not apply to or include all indebtedness due or to become due by the defendant to the creditors signing it, but only such indebtedness as was or might become due to them as sub-contractors under their existing contracts with the defendant under its contract with the State. The agreement expressly provides that as to contracts they might make after October 11th with the defendant for furnishing materials or labor in the completion of the service and kitchen building for the State Hospital at Cranston they were to be paid in full for such materials and labor. If, therefore, the agreement is operative as a composition with creditors the composition is partial and limited both as to persons and indebtedness, and it is not *simply* a composition, as it makes provision for future contracts to be paid in full from the balance to become due on the completion of defendant's contract with the State.

The question to be considered may be stated thus: Is the agreement of October 11th to be interpreted upon its per-

formance as a composition by the signing sub-contractors of their claims against the defendant for its indebtedness to them for materials and labor furnished by them in the erection of said service and kitchen building under their then existing contracts with it, whether said indebtedness was then actually due or was to become due thereafter? In other words, were the pro rata payments to them from the moneys afterwards received by the defendant under its contract with the State to be accepted by the signing creditors in satisfaction of their respective claims, whether paid in full or not? In effect the court below thus interpreted the agreement. The possibility that these claims might be paid in full is indicated by the provision that "if any balance remains, after all creditors on this work are paid in full, it is to be paid to the company." The agreement recognizes what would be the fact in any event, namely, that payment in full would extinguish the claims. It does not, however, in express terms state that the final pro rata payment, if in fact less than the sum then due, will discharge and extinguish the debt. The court below apparently interprets the early portion of the agreement reading, "We, the subscribers, . . . hereby agree to the following plan for carrying said work to completion and for the *payment* of our accounts" as if the word "payment" as there used means *satisfaction*.

It is stated in Bouvier's Law Dictionary, eighth edition, Vol. III, 2540, that "The word payment is not a technical term; it has been imported into legal proceedings from the exchange, and not from the law treatises." . . . "Payment is doing precisely what the payer has agreed to do." . . . "However, practically, the name of payment is often given to methods of release which are not accompanied by the performance of the thing promised." In *Kendall* v. *Brownson*, 47 N. H. 186, 203, it is said that the word "payment . . . is used in two senses; first, performance of a contract to pay money according to its stipulations; second, extinguishment of a cause of action arising from breach of a contract. 'Payment', as generally used in the

books, has the latter meaning." On page 204 this appears, "The difference between the two significations of payment is the difference between the performance of a contract and compensation accepted in satisfaction of a breach of contract." See also *Harrison* v. *Henderson*, 100 A. S. R. 393, note c, and 30 Cyc. 1181, note 6.

In an agreement drawn by a layman it might naturally be expected that the word "payment" would be used not in its most restricted sense but with the broader meaning generally given to it. And in interpreting the agreement in question it is both proper and necessary to consider the facts and circumstances attending its execution in order to determine its meaning, for example, the relations of the parties, the nature and situation of the subject matter, the apparent purpose in making the agreement, the preliminary negotiations leading up to it as throwing light upon the meaning of particular expressions used in the contract, and the construction which the parties by their acts have placed upon it. Apart from certain testimony of the plaintiff relative to the preliminary negotiations and the circumstances attending the execution of the instrument, there would seem to be little, if anything, in the case on which to base serious objection to the interpretation by the court below of the agreement and its action on the motions to direct the verdict. The only question suggested is whether or not there was such conflict of testimony as to require the submission to the jury of the question of the meaning of the agreement and particularly of the word "payment" as used in the agreement. The court, however, is of the opinion that there was no error made by the court below in its interpretation of the agreement and in directing a verdict for the defendant.

The plaintiff's exceptions are overruled and the case is remitted to the Superior Court for the entry of judgment on the verdict.

*Easton, Williams & Rosenfeld, Charles R. Easton,* for plaintiff.

*John P. Beagan,* for defendant.